| | |
|---|---|
| 1 | Robert L. Starr (183052) |
| | robert@starrlaw.com |
| 2 | Adam M. Rose (210880) |
| | adam@starrlaw.com |
| 3 | Theodore R. Tang, Esq. (313294) |
| | theodore@starrlaw.com |
| 4 | THE LAW OFFICE OF ROBERT L. STARR, APC |
| | 23901 Calabasas Road, STE #2072 |
| 5 | Calabasas, CA 91302 |
| | Telephone: (818) 225-9040 |
| 6 | Facsimile: (818) 225-9042 |
| 7 | Attorneys for Plaintiff |
| | Calabasas Luxury Motorcars, Inc. |

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALABASAS LUXURY MOTORCARS, INC., | Case No.: |
| Plaintiff, | **CLASS ACTION COMPLAINT FOR VIOLATION OF THE CARTWRIGHT ACT AND CALIFORNIA'S UNFAIR COMPETITION LAW** |
| v. | |
| GENERAL MOTORS, LLC.; GENERAL MOTORS FINANCIAL COMPANY; and DOES 1 through 10, inclusive, | |
| Defendants. | |

## **INTRODUCTION**

1. Plaintiff Calabasas Luxury Motorcars brings this action to remedy and enjoin ongoing antitrust and state law violations which stem from Defendants General Motors, LLC and General Motors Financial Company's (collectively "Defendants") anticompetitive conduct.

2. As alleged below, Defendants have committed flagrant violations of antitrust law and inflicted widespread harm on both new and used automotive dealers; their customers; and the automotive industry as a whole.

-1-
COMPLAINT

3. Specifically, Defendants have conspired to eliminate competition by refusing to allow non-GM dealerships to accept their leased vehicles as a trade-in and refusing to allow consumers to sell their vehicles to non-GM dealerships. Thus, where there was once a robust market for third-party lease payoffs and vehicle trade-ins, Defendants, through their coordinated conduct, have destroyed that competition.

4. Defendants have placed artificial and anticompetitive restrictions on the used vehicle market in order to ensure that they maintain dominance over the entire market for previously owned or leased GM vehicles. As a result of this anticompetitive conduct, Plaintiff and others similarly situated have suffered immense injury.

5. As described further below, Defendants and their subsidiaries, agents, or co-conspirators entered into and implemented a continuing combination and conspiracy to fix, raise, maintain, or stabilize retail prices for used GM vehicles sold in California. This activity constitutes an unlawful combination, trust, agreement, understanding, and concert of action in restraint of trade in violation of California Business and Professions Code §§ 16700 *et seq*. and 17200 *et seq*.

6. As a result of Defendants' unlawful conduct, Plaintiff and other members of the class paid artificially inflated prices for used vehicles, or have been entirely prevented from purchasing these used GM vehicles from lessees via third party payoff, or accepting these leased GM vehicles as a trade-in towards the purchase of a non-GM brand vehicle.

7. Non-GM franchise used car dealers, and non-GM franchise new car dealers who accept trade-ins, are direct targets of Defendants' conspiracy because they are eliminating competition in the secondary market for the purchase, sale or trade-in of used GM vehicles. In seizing control over the secondary market for its leased vehicles, GM has thwarted Plaintiff and other dealers' ability to enter or trade in this market. This is done for no other purpose than to restrict competition and wrongfully enrich GM franchise dealers.

# PARTIES

8. Calabasas Luxury Motorcars ("Plaintiff") is a California corporation, with its principal place of business located in Los Angeles, California.

9. Defendant General Motors, LLC ("GM") is a Delaware limited liability company with its principal place of business located in Detroit, Michigan.

10. All acts and omissions of GM's employees, agents, associates, partners, parents, or subsidiaries as alleged herein occurred while they were acting within the course and scope of their duties and GM is therefore responsible to Plaintiff under the doctrine of Respondeat Superior and/or other doctrines.

11. Defendant General Motors Financial Company, Inc. ("GMFC") is a Texas corporation with its principal place of business located in Fort Worth, Texas.

12. All acts and omissions of GMFC's employees, agents, associates, partners, parents, or subsidiaries as alleged herein occurred while they were acting within the course and scope of their duties and GMFC is therefore responsible to Plaintiff under the doctrine of Respondeat Superior and/or other doctrines.

13. Plaintiff is unaware of the true names or capacities of the Defendants sued herein as DOES 1 through 10, inclusive ("Doe Defendants"), and therefore sues said Doe Defendants by such fictitious names. Plaintiff will seek leave of this Court to amend this Complaint to insert the true names and capacities of such Doe Defendants when such information has been obtained. Plaintiff is informed and believes, and based on such information and belief alleges, that each of the fictitiously named Doe Defendants has participated in some way in the wrongful acts and omissions alleged below, and is liable to Plaintiff for damages and other relief to which Plaintiff is entitled.

# JURISDICTION AND VENUE

14. This Court has jurisdiction based on diversity of citizenship pursuant to 28 U.S.C § 1332(a).

15. This is a civil action in which the matter in controversy exceeds the sum of

$75,000, exclusive of interest and costs.

16. At least one member of the California Class is a citizen of a State different from at least one Defendant within the meaning of 28 U.S.C. § 1332(d)(2)(A).

17. The claims asserted by the putative class, when aggregated as required by 28 U.S.C. § 1332(d)(6), exceeds the sum of $5,000,000 within the meaning of 28 U.S.C. § 1332(d)(2).

18. The number of members of all putative classes alleged herein exceeds 100 in number within the meaning of 28 U.S.C. § 1332(d)(5)(B).

19. The primary defendants are not States, State officials, or other governmental entities within the meaning of 28 U.S.C. § 1332(d)(5)(A).

20. Venue is proper pursuant to 28 U.S.C. § 1391(a) because a substantial part of the acts or omissions giving rise to this claim occurred in the Central District of California.

21. This Court has supplemental jurisdiction over Plaintiffs' state law claims arising under statutory or common law pursuant to 28 U.S.C. § 1367 because the claims arise from a common nucleus of operative facts such that adjudication of both state and federal claims furthers the interests of judicial economy.

## FACTUAL ALLEGATIONS

22. As a result of the SARS-CoV-2 ("COVID-19") pandemic, there has been a severe disruptions to the global supply chain of motor vehicles.

23. This major squeeze on vehicle production for more than 18 months has resulted in a drastic shortage in supply while, at the same time, consumer demand for vehicles has dramatically risen. Unsurprisingly, this confluence of low supply and high demand has catapulted used and new car prices to record highs.

24. This unprecedented demand for vehicles has created a situation where lessees whose leases terms have not yet expired have found themselves in possession of a vehicle whose market value was worth significantly more than the amounts owed on their respective lease, as calculated by Civil Code Section 2987. In layman's terms,

as a result of high demand, these vehicles did not lose much if any value, in some instances have gained value and there is equity in these lease contracts

25. As a result of this increased equity, consumers are recognizing that they are able to trade-in or sell their vehicle for a significant profit.

## **THE STRUCTURE OF LEASES & VEHICLE TRADE-INS**

26. In structuring a lease payment during the lease's origination process, the "expected depreciation of the vehicle" is one of the main integers in calculating an appropriate monthly lease payment. Another portion of the calculus is intended to cover interest, and another portion is intended to serve as a profit for the lessor. The lease agreement itself will indicate that the vehicle has a residual value at the end of the lease. This residual value is theoretically intended to correlate with the amount of money that the vehicle will be worth at the end of the lease.

27. When the value of the vehicle ends up being higher than the payoff during the term of the lease, or winds up being worth more than the residual value at the end of the lease, then the vehicle has equity. If the vehicle has equity, this is because the lessee was paying more money than was actually necessary to protect the lessor from the expected depreciation of the vehicle's value.

28. In a closed-end consumer vehicle lease, the consumer is always entitled to purchase the vehicle during the term of the lease, or at the end of the lease.

29. Alternatively, the lessee is entitled to trade-in their vehicle during the lease and then sometimes use the trade-in as a down payment for the purchase or lease of another vehicle. The vehicle "trade-in" is a common, established transaction in the automobile industry, and it can be utilized towards a down payment when consumers invariably seek to acquire a new vehicle.

30. The vehicle trade-in is vital to consumer vehicle transactions because most consumers lack the liquidity to exercise the purchase option on their own. Furthermore, if a consumer exercises the purchase option on their own, the consumer will likely have to pay sales tax, which is an avoidable transaction cost when the

-5-
COMPLAINT

vehicle is sold to a dealership. Paying sales tax reduces the equity that the consumer has in the vehicle.

31. A practical example of this process occurs when a lessee will take their GM to a non-GM brand dealer; trade in their GM for a new vehicle by transferring their GM lease's purchase option over to the different brand dealer; and the different brand dealer will then utilize the residual value of the "trade-in" towards the consumer's purchase or lease of a new, non-GM vehicle.

32. As a point of emphasis, the practice of "third-party payoffs" or "vehicle trade-ins" is foundational to not only the used car business, but to the lessee's ability to capture any unexpected equity in their vehicles—a privilege implicit in the purchase option contained in every one of Defendants' lease agreements.

33. In fact, the practice of vehicle trade-ins is so common, that California statutorily codified a licensed vehicle dealer's rights and duties with respect to "trade-ins." Specifically, Cal. Vehicle Code § 11709.4 sets forth the manner in which a licensed motor vehicle dealer is supposed to "purchase or obtain a vehicle in trade in a retail sale…[which] is subject to a prior credit or lease balance" if, amongst other things, the dealer "tender[s] the agreed upon amount as provided in the written agreement to the lessor…or to the legal owner reflected on the ownership certificate, or to the designee of that lessor or legal owner within 21 calendar days of purchasing or obtaining the vehicle in trade." (Cal. Vehicle Code § 11709.4(a)(1)).

34. It should be noted that although § 11709.4 does not explicitly vest within all licensed dealers the ability to accept trade-ins, it must necessarily be assumed that the legal right to accept trade-in vehicles must exist. In other words, it would be implausible for the Legislature to regulate dealer conduct with respect to accepting trade-ins if dealers did not have the right to accept, and consumers did not have the right to present, "trade-ins" in the first instance.

35. When, like here, a legislative enactment is silent on the issue of whether a dealer has the free right to accept vehicle trade-ins, it must be assumed that such an

omission does not signal disapproval, but rather, that the conduct is so inherent in the idea of the trade itself, that it requires no statutory affirmation.

36. Similarly, Ca. Civil Code § 2987 discusses a "Lessee's right to early termination of lease contract; conditions; notice." In explaining a consumer's rights, Section (f) states, "Subdivisions (b) to (d), inclusive, do not apply if, prior to the scheduled expiration date specified in the lease contract, the lessee terminates the lease and purchases the vehicle or trades in the vehicle in connection with the purchase or lease of another vehicle."

37. Pursuant to Ca. Civil Code § 2987, consumers have the right to terminate their lease early in connection with the purchase or lease of another vehicle, and when doing so, the money owed to the lessor is the payoff as amortized, based upon the financial structure of the lease.

38. In light of a dealer's statutory right to accept vehicle trade-ins, we now turn to Defendants' unfair and unlawful business practices which form the basis of this Complaint.

**DEFENDANTS' UNLAWFUL AND UNFAIR BUSINESS PRACTICES**

39. Recently, due to the shortage of vehicles, and due to the rise in used vehicle values, Defendants have willfully sought to place an unfair restraint on trade in violation of California law. Specifically, Defendants have engaged in a pattern and practice of collusive conduct amounting to unfair competition by refusing to allow non-GM dealerships to accept their leased vehicles as a trade-in and refusing to allow consumers to sell their vehicles to non-GM dealerships.

40. By way of example, let us suppose that a consumer who has 10 months left on their GM lease is tired of driving the GM and now wants to lease a different brand vehicle. When that consumer arrives at a different brand dealership and attempts to trade in their vehicle, the different brand vehicle dealer is prevented from accepting the vehicle because GM refuses to allow non-GM dealerships to accept their vehicles as a "trade-in." The same is true if the consumer attempts to trade in the vehicle, or

sell the vehicle, to an independent used vehicle dealership.

41. Instead, Defendants will only allow the consumer to trade in the vehicle with GM brand vehicle dealerships. That is to say, if a person is leasing a GM, they are essentially stuck with a GM, and if they want to capture the equity in their vehicle, or trade-in the vehicle during the lease, they are relegated to dealing strictly with GM brand dealerships. GM brand dealerships thus have a control on the market, harming the fair trade of vehicles in the marketplace.

42. By keeping their vehicles on the "GM Merry-go-Round," GM not only prevents consumers from cashing out on their equity and/or using the value in their leased vehicles as a trade-in towards the purchase of a competitor-brand vehicle, but they are also preventing dealerships, such as Plaintiff, from exercising their right to purchase these leased vehicles as a trade-in pursuant to Vehicle Code § 11709.4.

43. Not only that, but the "GM Merry-go-Round" serves to prevent consumers from capturing the equity in their vehicle by requiring consumers to trade-in their vehicle at below market value. Disturbingly, GM brand dealerships are thus able to control the market, purchase leased vehicles from consumers, and then sell the same vehicle as "Certified Pre-Owned." Selling the vehicle with a "Certified Pre-Owned" designation is an opportunity for the GM brand dealership to make more money on the vehicle by further marking the vehicle up. It is also an opportunity for GM to sell another product, which is a "Certified Pre-Owned" warranty which is incorporated into the "Certified Pre-Owned" designation. Lastly, GMFC offers captive financing for "Certified Pre-Owned" vehicles, giving GMFC a slice of the pie. In this regard, Defendants are placing a restraint on trade in an effort to continuing selling their products (Certified Pre-Owned warranty designation and financing), unfairly harming non-GM dealerships, and violating the letter and spirit of California law.

## **DEFENDANTS' ANTICOMPETITIVE CONDUCT**

44. At all times relevant, Defendants and others entered into and engaged in a continuing unlawful trust in restraint of trade and commerce, described above, in

violation of Business and Profession Code § 16720.

45. These violations consisted of, but were not limited to, a continuing combination, trust, agreement, understanding, and concert of action among Defendants and others to restrain trade by refusing to allow non-GM dealerships to accept leased GM vehicles as a trade-in, and refusing to allow consumers to sell their vehicles to non-GM dealerships.

46. For the purpose of forming and effectuating this unlawful trust, Defendants and others have agreed, combined, and conspired as alleged herein.

47. Defendants have colluded with each other to engage in the wrongful conduct alleged herein. Defendants have engaged in this conduct for their mutual benefit including, but not limited to (1) ensuring to the greatest degree possible that only GM brand dealerships have access to GM vehicles after they are traded-in or sold at the end of the lease term; and (2) ensuring they capture as much profit as possible by getting the vehicles, designating the vehicles as "Certified Pre-Owned" vehicles in order to increase their price, and then reselling the vehicles to consumers who will finance the vehicles with GMFC. This is textbook collusive conduct.

48. If Defendants' anticompetitive conduct is allowed to continue unabated, it will continue to stifle the sale of used GM vehicles at non-GM dealerships. In other words, California residents will, for the most part, only be able to purchase a used GM from a GM dealership because GM will not allow lessees to sell or trade in their leased vehicle to anyone other than a GM dealership. Although this conduct will not impact vehicles which are purchased by consumers rather than leased, by controlling the market for vehicles which have been leased, Defendants are seizing major control over the market of these vehicles.

49. Defendants allocated their market share in California in order to artificially maintain control over the market for used GM vehicles to the detriment of Plaintiff.

50. In cornering the used GM-market, actual and future competition between Defendants, Plaintiff, and those similarly situated, will be eliminated, or substantially
-9-
COMPLAINT

reduced, and prices for GM's used vehicles will rise to levels they would never have risen in the absence of Defendants' monopolistic and anticompetitive conduct. Furthermore, consumers who wish to cash in on the equity in their leased vehicles will have reduced options, and thus will receive less money when selling or trading in their leased vehicles.

51. At all times relevant, the business activities of Defendants and their co-conspirators were within the flow of, and substantially affected, interstate trade and commerce.

52. In this case, the agreement and conspiracy between Defendants and their franchisees is a vertical agreement that restricts inter-brand competition. This vertical agreement actually operates to act as a restraint between horizontal competitors. Such vertical restraints foreclose competitors, such as Plaintiff and those similarly situated, from entering or competing in the market for used GM vehicles. Obviously, this has the effect of eliminating GM's competitive threats within the used car market.

53. As a proximate result of the Defendants' unlawful contract, combination, or conspiracy, Plaintiff and those similarly situated have sustained damages to their businesses and property in an amount in excess of the jurisdictional minimum.

## GM ADMITS ITS WRONGFUL CONDUCT

54. On June 24, 2021, Autonews.com wrote an article stating it obtained a message stating, "GM Financial will stop working with non-General Motors dealerships on off-lease vehicle payoffs starting July 1 to ensure GM dealerships have priority access to the vehicles coming back to market." The article goes on to say that the change was being enacted, "To better support our GM dealers through the current economic environment and the challenges they're encountering sourcing quality pre-owned vehicles." The article states that a spokesperson advised, "This policy would be in place for the remainder of 2021, after which point GMFC will assess its position on off-lease buyouts."

55. The article also states, "Joe Bartuch, Executive Vice President of U.S. Sales and Credit (for GM Financial) told GM that the captive finance company would notify customers over the coming weeks that the terms of their lease agreement stipulate they are only able to submit a lease purchase request by contacting GM Financial Customer Experience or working with a participating GM dealership."

56. Finally, the article quotes Todd Wenzel, a dealer principal of Michigan Group, as saying, "GM moved quickly to address dealer concerns about outside brands scooping up off-lease inventory." The quote goes on to say, "GM Financial heard what the GM dealers wanted, and they reacted very quickly – within days from when the dealer council brought them this issue. If you're not a GM dealer, it might not be the best position. But with inventory so tight on new and used, it's a great move for the GM participating dealer."

## FACT'S RELEVANT TO PLAINTIFF

57. At all times herein relevant, Plaintiff, a high-end luxury used vehicle dealership, has had numerous putative customers attempt to trade-in their GM vehicles which were still under lease to Plaintiff, or sell their GM vehicles to Plaintiff, only to have Defendants refuse and prohibit any attempt by Plaintiff to accept these vehicles as a trade in. Defendants have refused to allow Plaintiff to pay off the vehicles and take title. Instead, Defendants will only allow consumers to trade-in their vehicles with an authorized GM dealership.

58. There is a very robust market for Chevrolet Tahoe, Cadillac Escalade, and GMC Yukon vehicles, which Plaintiff has wanted to purchase and has been prevented from purchasing due to Defendants' unlawful conduct.

59. In essence, Defendants have cornered the used vehicle market by refusing to allow lessees to trade-in their vehicles with anyone other than Defendants' affiliates.

60. Defendants' conduct as alleged herein violates California's unfair business practices statute, California Business and Professions Code § 16700 et seq., and Business and Professions Code § 17200 et seq. (the "UCL").

61. Plaintiff has suffered damage as a result of Defendants' wrongful, unfair, and unlawful conduct.

62. Plaintiff seeks injunctive relief compelling Defendants' to immediately cease violating California law by refusing to allow vehicle trade-ins which, pursuant to Vehicle Code § 11709.4 and Civil Code § 2987, are presumed effective and lawful upon a dealer tendering full payment of the vehicle's value.

## CLASS ACTION ALLEGATIONS

63. Plaintiff brings this action on behalf of itself, and all others similarly situated.

64. The class consists of all non-GM vehicle dealerships in California whose rights to accept trade-in vehicles and purchase GM leased vehicles have been violated as a result of Defendants' wrongful conduct.

65. Plaintiff reserves the right to establish subclasses.

66. There is a well-defined community of interest, and the class is readily ascertainable:

    (a) Numerosity: The members of the class are so numerous that joinder is unfeasible and impractical. The membership of the entire class is unknown to Plaintiff at this time. However, the class is estimated to be greater than 100 individuals and the identity of such membership is readily ascertainable.

    (b) Typicality: Plaintiff's claims are typical of the class members with whom it has a well-defined community of interest.

    (c) Adequacy: Plaintiff will fairly and adequately protect the interests of each class member. Plaintiff acknowledges it has an obligation to make known any relationship, conflicts, or differences with any class member. Plaintiffs' attorneys are versed in the rules governing class action discovery, certification, and settlement. Plaintiff has incurred and will continue to incur costs and attorneys' fees to prosecute the action for the benefit of each class member.

    (d) Superiority: Class action adjudication is superior to other methods, as it will achieve economies of time, effort and expense compared with separate lawsuits,

and will avoid inconsistent outcomes because the same issues can be adjudicated in the same manner for the entire class.

67. There are common questions of law and fact as to the class (and subclass, if any) that predominate over questions affecting only individuals, including but not limited to whether Defendants engaged in unfair competition, and whether Plaintiff and class members are entitled to injunctive relief enjoining Defendants from refusing to allow vehicle trade-ins with non-GM dealerships.

## FIRST CAUSE OF ACTION
## VIOLATION OF THE CARTWRIGHT ACT
### (Against All Defendants)

68. Plaintiff re-alleges and incorporates by reference each and every allegation contained in the paragraphs above and, to the extent necessary, pleads this cause of action in the alternative.

69. At all times relevant, Defendants and their co-conspirators, entered into a continuing contract, combination, or conspiracy to unreasonably restrain trade and commerce in violation of the Cartwright Act, California Business and Professions Code § 16700 et seq.

70. As alleged herein, Defendants, by their unlawful conspiracy, have artificially placed a restraint on trade and artificially fixed, raised, inflated, and interfered with the market for used in violation of California Business and Professions Code § 16700 et seq.

71. The contract, combination, or conspiracy consisted of a continuing agreement, understanding, and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain, and stabilize the prices of, and/or allocate the market for the used GM vehicles sold in California.

72. For the purpose of formulating and effectuating their contract, combination, or conspiracy, Defendants and their co-conspirators contracted, combined, or conspired to knowingly and intentionally refusing to allow licensed vehicle dealers to accepted

leased GM's vehicles as "trade-ins" and to purchase GM leased vehicles from consumers, in derogation of Plaintiff's statutory rights, the rights of consumers, and the rights of the putative class, pursuant to Vehicle Code §11709.4 and Civil Code § 2987.

73. As a direct result of the unlawful conduct of Defendants and their co-conspirators in furtherance of their continuing contract, combination, or conspiracy, Plaintiff and those similarly situated have been injured in their business and property and have suffered damage due to the herein referenced restraint of trade. Plaintiff and those similarly situated would never have faced these barriers to commerce or entrance into the market in the absence of Defendants' and their co-conspirators anticompetitive conduct as alleged herein.

74. The result of this illegal anticompetitive activity is that there is a reduced number of used GM vehicles available on the market for purchase by non-GM brand dealers for resale, stifling competition, harming the putative class and harming consumers.

75. Defendants have, by theirs conduct, engaged in a violation of the Cartwright Act.

76. Defendants' conduct as set forth above presents a continuing threat to the existence and vitality of the used car market, and these unlawful acts will persist and continue unless and until this Court issues appropriate injunctive relief.

77. Plaintiff also seeks damages, attorneys' fees, and costs.

## SECOND CAUSE OF ACTION

## VIOLATION OF BUSINESS AND PROFESSIONS CODE SECTION 17200

### (Against All Defendants)

78. Plaintiff re-alleges and incorporates by reference each and every allegation contained in the paragraphs above and, to the extent necessary, pleads this cause of action in the alternative.

79. California Business and Professions Code § 17200 prohibits acts of unfair

competition, including any "unlawful, unfair, or fraudulent business act or practice" and "unfair, deceptive, untrue, or misleading advertising."

80. As alleged herein, Defendants have engaged in unlawful and unfair business practices.

81. Plaintiff and Defendants are "persons" as that term is defined in Business and Professions Code § 17201.

82. Defendants violated the UCL by knowingly and intentionally refusing to allow licensed vehicle dealers to accept Defendants' vehicles, which were still under lease, from accepting those vehicles as "trade-ins"—which is Plaintiff's statutory right pursuant to Vehicle Code §11709.4 and Civil Code § 2987.

83. Defendants' unlawful and unfair business acts and practices alleged herein caused damage to Plaintiff and other putative class members.

84. As a direct and proximate result of Defendants' acts and practices in violation of the UCL, Plaintiff has suffered injury in fact and lost money or property and will continue to do so.

**Unfair Prong**

85. An act or act or practice is "unfair" if the consumer injury is substantial; is not outweighed by any countervailing benefits to consumers or to competition; and is not an injury the consumers themselves could reasonably have avoided. An act or practice also is unfair if it offends an established public policy or is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers. An act or practice also is unfair if Plaintiff's claims are "tethered" to specific constitutional, statutory or regulatory provisions.

86. Defendants' actions constitute an "unfair" business practice because Defendants refused to allow Plaintiff to exercise his statutory right to accept a trade-in vehicle for value pursuant to Vehicle Code § 11709.4 and Civil Code § 2987.

87. Defendants' business practices are unfair because they offend established public policy and/or are immoral, unethical, oppressive, unscrupulous, and/or

substantially injurious to consumers in that consumers are led being prevented from exercising the statutory rights alleged herein.

88. Additionally, conduct is "unfair" because it is tethered to a specific constitutional, statutory or regulatory provision. Here, Defendants' unfair conduct is tethered to its interference with Plaintiff's statutory rights pursuant to Vehicle Code § 11709.4 and Civil Code § 2987.

89. All of the acts and practices of Defendants as described in this complaint constitute "unfair" business acts and practices. A business act or practice is "unfair" under the UCL if the reasons, justifications, and motives of the alleged wrongdoer are outweighed by the gravity of the harm to the alleged victims. Plaintiff has suffered injury in fact and a loss of money or property as a result of Defendants' unfair business acts and practices as set forth herein.

90. Defendants' conduct is unfair because it prevents consumers from having any hope at all of capturing any of the equity in their lease, or terminating their lease early, unless the consumer pays out of their own pocket to pay the vehicle off, sells the vehicle to a GM dealership or trades the vehicle in at a GM dealership. From a practical perspective, consumers often lack the desire or liquidity to pay off the vehicles. As a result, consumers who wish to terminate their lease early or capture any of the equity in their lease are forced to do so at a GM dealership. This unfair and unlawful conduct harms competition, and unfairly prevents non-GM dealerships' from transacting business.

91. As a direct and proximate result of Defendants' acts and practices in violation of the UCL, Plaintiff has suffered damages.

92. Defendants' conduct does not benefit consumers or competition. Plaintiff could not reasonably avoid the injury suffered or the injury that will be suffered. Defendants' conduct only benefits Defendants themselves.

93. The gravity of the conduct as described above outweighs the justification, motive, or reason therefor, is immoral, unethical, and unscrupulous, and offends

established public policy that is tethered to legislatively declared policies as set forth in the laws detailed above, or is substantially injurious to the public, for the reasons set forth above.

94. Defendants could have and should have furthered their legitimate business interests by allowing non-GM dealerships to accept GM vehicles as trade-ins.

95. Defendants could have and should have furthered their legitimate business interests by abstaining from aggressively interfering with the statutory rights of competitor dealerships and consumers.

96. To the extent that any definition of "unfair" requires a balancing test or weighing various factors, such an inquiry is fact intensive and requires a full factual record as to Defendants' justification and motives for its conduct, and as to the impact of Defendants' conduct on Plaintiff and others.

97. Defendants' acts of unfair competition as set forth above present a continuing threat and will persist and continue to do so unless and until this Court issues appropriate injunctive relief. Plaintiff also seeks attorneys' fees and costs

### **Unlawful Prong**

98. A business practice is "unlawful" under the UCL if it is forbidden by law or regulations, including the standard of professional conduct.

99. The violation of any law or regulation may serve as the predicate for a violation of the "unlawful" prong of the UCL.

100. Pursuant to Vehicle Code § 11709.4 and Civil Code § 2987, a lessee has the right to terminate a lease contract at any time prior to the date specified in the lease contract and there is a methodology for any dealership, GM or otherwise, to pay off the vehicle. When consumers attempt to terminate that contract by trading in or selling their leased vehicles at non-GM dealerships, Defendants interfere with this rights by arbitrarily and capriciously refusing to allow the vehicle to be traded in at a non-GM dealership, and thus imposing unfair and unreasonable restrictions on a licensed dealer's statutory right to accept the vehicle as a "trade-in." The only actual

reason that Defendants do this is to gain an unfair advantage in the marketplace.

101. Defendants have, by theirs conduct, engaged in unfair competition and unlawful and unfair business practices.

102. Defendants' acts of unlawful competition as set forth above present a continuing threat to the existence and vitality of the used car market, and these unlawful acts will persist and continue unless and until this Court issues appropriate injunctive relief.

103. Plaintiff also seeks attorneys' fees and costs pursuant to, inter alia, C.C.P. § 1021.5.

## JURY DEMAND

104. Plaintiff hereby demands a trial by jury on all issues of fact.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

First Cause of Action

1. For an order enjoining Defendants from continuing the unlawful combination and conspiracy alleged in this Complaint
2. An award of damages to Plaintiff and those similarly situated in an amount to be trebled under antitrust law
3. Attorneys' fees and costs
4. Pre-judgment interest; and
5. For other relief that this Court deems just and proper.

Second Cause of Action

1. For an order enjoining Defendants from refusing to allow vehicle dealerships the ability to exercise their statutory right to accept vehicle trade-ins pursuant to Vehicle Code § 11709.4
2. Attorneys' fees and costs pursuant to Code of Civil Procedure § 1021.5
3. Pre-judgment interest; and

4. For other relief that this Court deems just and proper.

Date: December 10, 2021

LAW OFFICE OF ROBERT L. STARR

/S/
_____
Robert L. Starr
Attorney for Plaintiff
Calabasas Luxury Motorcars